TERRY R. MILLER (Colo. Bar No. 39007)
millerte@sec.gov
STEPHEN C. MCKENNA (Colo. Bar No. 28744)
mckennas@sec.gov
1961 Stout Street, Suite 1700
Denver, Colorado 80294
Telephone: (303) 844-1000
Facsimile: (303) 297-3529
Attorneys for Plaintiff
United States Securities and Exchange Commission

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>  vs.<br><br>SHAWN C. CUTTING,<br><br>       Defendant,<br>and<br>CRYPTO TRADERS MANAGEMENT, LLC,<br>JANINE M. CUTTING,<br>GOLDEN CROSS INVESTMENTS, LLC,<br>LAKE VIEW TRUST, and<br>TYSON TRUST,<br><br>       Relief Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**Demand For Jury Trial** |

Plaintiff, the United States Securities and Exchange Commission (the "SEC") alleges as follows:

### SUMMARY

1.    The SEC brings this emergency enforcement action to stop an ongoing fraudulent

and unregistered offering of securities and misappropriation of money received from investors by Defendant Shawn Cutting.  Since at least October 2017 to present ("Relevant Period"), Cutting has raised at least $6.9 million from over 450 investors by representing that he is a seasoned financial adviser who would pool their money to trade digital assets and return a profit.  In truth, Cutting had no experience as a financial adviser, and rather than invest investor money as promised, Cutting used much of the money to pay for various personal expenses, including home improvements, cars, and his daughter's wedding.

2.      Cutting perpetuated his fraud by making hundreds of thousands of dollars in Ponzi-like payments to investors and by sending investors false periodic updates that described his purportedly successful trading and investment returns, at times touting gains of over 50% in a single month.

3.      Since February 2020, Cutting has either ignored or denied investor requests to withdraw their funds, instead offering excuses, including that his inability to process withdrawals was caused by his efforts to comply with state and federal laws.

4.      Throughout the fraud, Cutting transferred money from investors to his spouse and at least one company and trusts that he owned or controlled.  Each of these Relief Defendants received illicit proceeds from Defendant's fraud to which they have no legitimate claim.

5.      As a result of the conduct described in this Complaint, Defendant violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e(a) and (c) and §77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**JURISDICTION AND VENUE**

6.      The SEC brings this action pursuant to authority conferred on it by Section 20(b) of

the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Exchange Act  [15 U.S.C. §§ 78u(d) and 78u(e)] to restrain and enjoin Cutting from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.  The SEC seeks temporary, preliminary, and permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon, and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)], and such other relief that the court may deem appropriate.

7.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a)].

8.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because Cutting resides in this district and certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district.

## DEFENDANT

9.      **Shawn C. Cutting**, resides in Sandpoint, Idaho.  Cutting is the owner, principal operator, and managing member of Crypto Traders Management, LLC.  He communicated directly with investors and prospective investors, and conducted trading in digital assets for CTM.  Cutting has never held any securities licenses and is not registered with the Commission in any capacity.

## RELIEF DEFENDANTS

10.      **Crypto Traders Management, LLC** ("CTM"), is an Idaho limited liability company formed in January 2018, with a principal place of business in Bonner County, Idaho.

CTM was administratively dissolved by the Idaho Secretary of State effective May 15, 2019, and has not been reinstated.  The entity purports to be a hedge fund that invests in digital assets.

11.     **Janine M. Cutting** resides in Sandpoint, Idaho.  Janine Cutting is Shawn Cutting's wife.  Janine Cutting is a signatory on the CTM bank account, and she received illicit proceeds from Defendant's fraud to which she has no legitimate claim.  Specifically, Janine Cutting used almost $58,000 in investor money for personal expenses, including writing checks on the CTM's account totaling almost $12,000.

12.     **Golden Cross Investments, LLC ("Golden Cross")** is an Idaho limited liability company, formed by Cutting in February 2019, with its principal place of business in Blanchard, Idaho.  Golden Cross was established by Cutting to hold personal investments outside of CTM.  Golden Cross received illicit proceeds from Defendant's fraud to which it has no legitimate claim, including receipt at least $300,000 in money from investors in CTM.

13.     **Lake View Trust** is an irrevocable spendthrift trust formed by Cutting and his wife, the trustees, on or about February 4, 2018, for the benefit of Cutting's two children.  Lake View Trust received illicit proceeds from Defendant's fraud to which it has no legitimate claim, including receipt of approximately $48,000 in money from investors in CTM.

14.     **Tyson Trust**, is a trust formed by Cutting and his wife, the trustees, on or about February 4, 2018, for the benefit of Lake View Trust.  Tyson Trust is a member of CTM and is entitled to 90% of its profit, loss, and capital.  Tyson Trust received illicit proceeds from Defendant's fraud to which it has no legitimate claim, including receipt of approximately $55,000 in money from investors in CTM.

## FACTS

### I.   Cutting Raised Money From Investors by Offering and Selling Securities

#### *Cutting Raised Money for His Crypto Trading Club*

15.     Beginning no later than October 2017, Cutting began soliciting investors in his "Crypto Trading Club" ("CTC").  Cutting represented to investors and prospective investors orally and in emails that if they invested in CTC, he would pool their investment with other investor money in a private fund, invest in digital assets, and then share the profits with them. At all relevant times, Cutting controlled CTC and was solely responsible for the trading associated with CTC.

16.     From November 2017 through the end of 2017, Cutting offered to pay investors if they brought in other investors with whom he had no pre-existing relationship.

17.     Cutting's records reflect that by the end of December 2017 more than 300 investors from numerous states and foreign countries had invested in CTC.  At least $3.3 million was raised.

#### *Cutting Formed CTM and Raised Additional Investor Funds*

18.     In January 2018, Cutting created CTM.  Thereafter, Cutting treated CTC investors as CTM investors, and proceeded to trade all investor funds in the same manner (hereinafter, CTC and CTM are referred to collectively as "CTM").

19.     From CTM's formation in January 2018 until at least May 2020, Cutting raised an additional approximately $3.6 million from over 150 investors.

20.     CTM had no private placement memorandum or other traditional offering documents.  In emails soliciting investors, Cutting characterized CTM as a hedge fund that traded digital assets, and claimed that he had considerable experience as a financial adviser and trader of digital assets.

21.     Beginning in January 2019, at CTM's request, many investors executed a CTM Service Agreement that purported to describe the terms of investment with CTM.  The Service Agreement provided that CTM would receive a management fee based on the profits generated and that following an initial 90-day lockup period, there were no restrictions on investors withdrawing their funds at any time.

22.    CTM did not register its offering of securities with the SEC.

23.    Certain CTM investors are retirement-age and did not meet the income or net worth requirements for accredited investors.  Neither Cutting nor CTM took reasonable steps to verify investors' accredited status.  For example, investors were not asked to nor did they provide CTM with any records to verify their net worth or income.

24.    In total, from approximately October 2017 through at least May 2020, Cutting's records reflect that he and CTM received at least $2.4 million in cash and an additional $4.5 million in digital assets from more than 450 investors.  Investors sent cash investments to CTM's bank accounts and other accounts in Cutting's control, and sent digital assets to accounts in Cutting's control.

25.    Cutting has been unable to fulfill withdrawal requests. After numerous investors complained about not being paid after making a withdrawal request, on July 23, 2019, Cutting sent an email to those investors.  In that email, Cutting acknowledged that "delays that have accumulated over the past 6 months," but Cutting blamed his inability to process withdrawal requests on his compliance efforts with "State and Federal laws," withdrawal limits from the digital asset trading platforms, theft, hacking, and the purported loss of $900,000 when an exchange holding CTM assets closed.  Cutting assured investors that "[t]hese minor setbacks are completely normal and out of our control, but we will always solve the tasks at hand and we will continue to work extensively to resolve all matters" and promised to "continue to move forward to do safe, but aggressive trading and send out monthly spreadsheets as usual."

## II. Cutting Misappropriated Investor Money and Made Ponzi Payments

26.    As alleged herein, Cutting represented to investors that through CTM, he would pool their money and trade digital assets.  From January 2018 through May 2020, investors invested at least $1.69 million of cash into CTM by sending checks or wiring funds to CTM accounts.

27.    Rather than use investors' funds for trading as he had represented, Cutting misused hundreds of thousands of dollars.  Cutting used none of the investor cash that was deposited into the CTM accounts for digital asset trading.  Specifically, Cutting transferred money from CTM

accounts to his personal accounts and/or expended money directly from CTM's bank accounts for his personal expenses, including the following:

- $344,900 transferred to Golden Cross, Cutting's personal investment company. At least $35,392 of this money was transferred from Golden Cross to Lake View Trust, a trust over which Cutting and Janine Cutting serve as trustees;

- $58,000 transferred to Tyson Trust, a trust over which Cutting and Janine Cutting serve as trustees;

- Over $200,000 used to pay for miscellaneous personal expenses such as groceries, sporting goods, clothing, gold and silver coins, and meals;

- $121,810 used to pay for home improvements;

- $108,303 in cash or check withdrawals;

- $11,929 used to pay for improvements to cars; and

- $4,000 used to pay for expenses associated with Cutting's daughter's wedding.

Of the amounts described above that Cutting misused, $57,916 was transferred to, or used by, Janine Cutting, including $11,700 in checks she wrote on a CTM bank account. Neither Janine Cutting, Golden Cross, Lake View Trust, or Tyson Trust have provided any goods or services in exchange for any investor funds.

28.     Cutting misappropriated hundreds of thousands of dollars. In certain instances, Cutting's misappropriation took place almost immediately following CTM's receipt of investor money. For example, on July 19, 2019, an investor deposited $500,000 into CTM's bank account, which had an existing negative account balance. Within three days, Cutting transferred over $300,000 to Golden Cross, his personal investment company.

29.     Cutting also made Ponzi payments to investors. Cutting did not generate sufficient trading profits with which to pay investors returns. From March 2018 through December 2019, Cutting also made at least $762,302 in Ponzi-like payments by using money from investors to meet withdrawal requests by other investors.

30.     For example, on July 18, 2019, CTM had a balance in its bank account of -$10,044. On July 19, 2019, CTM received $500,000 of new investor money, and over the next week, Cutting used over $70,000 of that money to pay multiple investors requesting withdrawals.

31.     By August 1, 2019, Cutting had misappropriated hundreds of thousands of dollars and misleadingly made payments to investors that suggested that CTM was profitable, such that nearly all of the money raised up until that time from investors placed in CTM accounts was gone, leaving an account balance of $44,316. The balance at the end of 2019 was $104.50.

**II.     Cutting Made False and Misleading Statements to Investors in Connection With the Securities Offering**

**A. Cutting Made False and Misleading Statements About the Intended Use of Investor Monies**

32.     Cutting repeatedly represented to investors that he would and did pool their money, invest in various digital assets, and then share profits. Investors understood from conversations with Cutting and emails that Cutting would invest their money in crypto currency

33.     Consistent with these representations, Cutting drafted an email dated October 14, 2017, stating investors' money would "immediately go to the exchanges and [be] placed in trading," and that "after taking profits, I will convert it back into Bitcoin and I will give you the option to have me send you the profits to your wallet, let it ride or whatever amount you would like."

34.     Similarly, in November 2017, Cutting met with potential investors at his home, and during that meeting, he described his plan to invest their money. Cutting showed the potential investors a trading account and trading platforms for digital assets on his own computer.

35.     From at least February 2018 through May 2020, Cutting emailed all or nearly all CTM investors an individualized monthly "Earnings Update." The Earnings Update purported to reflect earnings from digital asset trading by CTM that was added to the value of investments each month.

36.     Beginning in January 2019, Cutting provided investors a document called the CTM Service Agreement, which numerous investors executed at his request.  The Service Agreement provided that CTM would receive a "management fee of 30% of earnings generated each reporting period (typically every month)."  The Service Agreement stated that, following an initial 90-day lockup period, there were no restrictions on investors withdrawing their funds at any time.

37.     A reasonable investor would have understood from these statements that Cutting would use their money to trade digital assets in order to return profits in which Cutting and the investors would share.  Based on the Service Agreement, a reasonable investor would have understood that Cutting would use their money to generate earnings and that no more than 30% of the earnings generated each month would be paid to Cutting or CTM.  Investors would not have understood that their money would be misappropriated or used to make Ponzi-like payments to earlier investors.

38.     Cutting's statements regarding the use of investor funds were false and misleading because Cutting intended to use money from investors for personal expenses.  Cutting misappropriated hundreds of thousands of dollars, the same month he received it, for personal expenses and distributions to his wife and entities under his control, and used money from investors to pay for home improvements, cars, his daughter's wedding, and to make Ponzi-like payments.

39.     Each of the above disclosures and representations regarding Cutting's intended use of money from investors were false when made, and Cutting knew or was reckless in not knowing, and should have known, that the statements were false and misleading.

40.     Cutting omitted to state material facts that were necessary to render his disclosures and representations regarding his use of money from investors not misleading.  These omissions include that investor funds were misappropriated and used to make Ponzi-like payments to other investors.

41.     The above misrepresentations and omissions regarding the use of money from investors were material to investors and potential investors because, among other things, they believed their investments would be used for trading consistent with Cutting's disclosures and because any amount Cutting misappropriated or used to make Ponzi-like payments necessarily decreased the amount of money available to Cutting to effectuate the intended trading.

**B.  Cutting Made False and Misleading Statements About Trading Profits**

42.     The Earnings Updates referenced above purported to include information about each investor's investment with CTM that included:  the investor's "Gains" as a percentage, and in dollar amounts; "Earnings," "Deposits," "Withdrawals," and a total "Active Investment," which purported to represent the then-current total dollar value of the investor's account.  Cutting was ultimately responsible for the content of these Earnings Updates and for disseminating them to investors.

43.     The individualized monthly Earnings Updates that Cutting emailed investors misstated CTM's digital asset trading and returns.  General monthly updates described purported trading and investment returns that exceeded 50% in a single month.

44.     For example, after Investor A made his initial investment of $13,766 on November 1, 2018, Cutting sent Investor A Earnings Updates and separate emails with narrative descriptions of digital asset trading, including the following:

| Sample Emails to  Investor A | Purported Profit | Purported Value of Investment | Narrative Descriptions |
|---|---|---|---|
| Two emails on December 1, 2018, including Earnings Update | "gain of 9.00%" | Active investment of $15,004.94 | "November was a crazy month in the crypto world for it had a major down swing that dropped the total Coin Market Cap over -40% . . . But ……..with tethering where we could, we made hundreds of day and swing trades that brought the -40% up to a positive 9% gain for the month of November.  This gain has been added to your portfolio." |
| Two emails on January 2, 2019, | "gain of 7%," which included | Active Investment of $16,055.28 | digital assets suffered another "-26%" loss, "but since we constantly day and |

10

| Sample Emails to Investor A | Purported Profit | Purported Value of Investment | Narrative Descriptions |
|---|---|---|---|
| including Earnings Update | "earnings" of "$1,050.34," | | swing trade with a certain percentage of our portfolio and continue in a holding pattern with the majority, we were able to get up to a 7% gain." |
| Two emails on February 2, 2019 including Earnings Update | CTM gained 4.5% in January, which translated to a gain of "$722.48" | Active Investment of $16,777.76 | the "Coin Market Cap dropped over -21% form the month of January, but we were able to day/swing trade our short positions enough to offset the loss and ended up in the green for a 4.5% gain that has been added to your portfolio." |
| March 4, 2019 Earnings Update | CTM gained 7.10% in February, which translated to a gain of "$1,191.22" | Active Investment of $17,968.98 | |
| April 2, 2019 Earnings Update and April 3 Email | CTM gained 8.5% in March, which translated to a gain of "$1,527.36" | Active Investment of $19,496.34 | "Bitcoin and many other alts are the highest they've been since October of 2018.  In the 1st 48 hours of April, the total Coin Market Cap rose from 145 Billion to over 176 Billion." |
| May 4, 2019 Earnings Update and May 6 email | CTM gained 6.00% in April … translated to a gain of "$2,165" | Active Investment of $38,257.91 | "We keep reserves of about 20-25% of our portfolio to day and swing trade with to offset the down or lateral conditions.  The strategy of Long term thinking will by a mile, yield in far better returns, as opposed to the 'Get rich Quick' type of thinking.  1-10%+ average gains a month are good, but setting up trades for the long run to get 1000x - 10,000x+ gains far exceed the short term gains." |
| June 5, 2019 Earnings Update | CTM gained 6.00% in May, … translated to a gain of "$2,358.08" | Active Investment of $41,659.51. | |
| July 2, 2019 Earnings Update | CTM gained 6.67% in June, which translated to "earnings" of $2,778.68 | active investment to $44,438.19 | |

45.    Investor A invested another $17,092 in cash on April 22, 2019, and $500,000 on July

18, 2019.

46.     All or nearly all CTM investors were provided similar monthly statements.

47.     A reasonable investor would have understood from the Earnings Updates that Cutting invested their money in digital assets, would invest future investments in digital assets in a similar fashion, and that CTM, and in turn the investor, had the rates of return as indicated in each Earnings Update.

48.     The Earnings Updates were false and misleading because the money investors deposited with CTM was not used for trading and therefore could not generate the returns Cutting represented.

49.     The disclosures in the Earnings Updates were false when made and Cutting knew or was reckless in not knowing, and should have known, that the statements were false and misleading.

50.     The Earnings Updates were material to investors because, among other things, investors would have wanted to know their rate of return in deciding whether to make further investments with Cutting or whether to withdraw their investment.

51.     Many investors, after receiving the Earnings Updates with false and overstated trading profits, maintained their existing investment with Cutting, and in some instances, they invested additional money.

### C.  Cutting Misrepresented That CTM's Reported Returns Had Been Reviewed by Third-Party Auditors and CPAs

52.     In an August 17, 2018 email to CTM investors, Cutting touted the law firm, "great Admin team" and "auditing and CPA company" that he had retained on behalf of CTM.  Cutting represented that a specific fund administrator "out of New York" was retained to "make sure that [CTM and Cutting] do our job correctly."

53.     Similarly, in a December 8, 2019 email to all or nearly all CTM investors, Cutting explained how the Earnings Updates were generated:

The short version of how the reporting works, is that CTM (us) reports the trades averaged each week with the gains/losses to the back office, then the Admins do what they do in the back office and when they are done, they report it to the Auditors.  After the Auditors do their thing in the back office, they report it to the CPA's.  Once all the reporting is finalized, the [sic] it goes back out to the Admins, so that the Admins can send out the reports out of the back office.

54.   A reasonable investor would have understood from these statements that Cutting employed third-party auditors and Certified Public Accountants ("CPAs") to verify CTM's monthly trading results and profits.

55.   Cutting's statements regarding CTM's use of third-party auditors and CPAs to verify CTM's monthly trading results and profits were false and misleading because neither CTM nor Cutting employed third-party auditors or CPAs to do that.  Instead, Cutting provided monthly statements including false and overstated returns. Cutting's statement's that investors' accounts had fluctuated in in value based on CTM's false monthly return was false and misleading because, as explained above, funds deposited by investors were not actually invested in digital assets.

56.   Each of the above disclosures and representations regarding CTM's use of third-party auditors and CPAs were false when made, and Cutting knew or was reckless in not knowing, and should have known, that the statements were false and misleading.

57.   Cutting omitted to state material facts that were necessary to render his disclosures and representations regarding CTM's use of third-party auditors and CPAs not misleading.  These omissions included disclosing that in fact, CTM did not employ third-party financial professionals to do the work described in the representations to investors set forth above.

58.   The above misrepresentations and omissions regarding CTM's use of third-party auditors and CPAs were material to investors because, among other things, they believed that the individualized monthly Earnings Updates were based upon trading records that multiple third-party financial professionals had reviewed and verified.  Reasonable investors would have wanted to know that Cutting alone had prepared the monthly Earnings Updates purporting to show their

returns.

59.     165 investors made numerous additional investments totaling over $3 million after receiving the false Earnings Updates.

### D. Cutting Made False and Misleading Statements About His Experience

60.     Cutting also made false representations about his qualifications to investors. In October 2017, for example, Cutting drafted an email representing that he had been "a financial advisor for years and ha[d] … securities licenses."

61.     A reasonable investor would have understood from this disclosure that Cutting had worked as a financial adviser and held securities licenses.

62.     The representations that Cutting had been a financial adviser and had securities licenses were false and misleading because Cutting had no experience as a financial adviser, never held any securities licenses, and has no securities background. After completing high school, Cutting operated a floor covering business, held various manual labor jobs, worked for a well drilling company, and just before starting CTM, worked for a multi-level marketing firm.

63.     The representations that Cutting had been a financial adviser and had securities licenses were false and misleading when made and Cutting knew or was reckless in not knowing, and should have known, that the representations regarding his experience and credentials were false and misleading.

64.     The false and misleading representations that Cutting had been a financial adviser and had securities licenses were material to investors because, among other things, experience as a financial adviser and the knowledge and scrutiny by regulators required to obtain securities licenses would enhance the likelihood of a successful investment.

### III.   Cutting Engaged in Numerous Deceptive Acts

65.     Cutting committed deceptive acts in furtherance of this fraud. Among other things,

14

and as more fully alleged above, Cutting:

   a.   misappropriated investor funds;

   b.   made Ponzi-like payments to investors;

   c.   refused to meet valid redemption requests or provide accurate information as
        to CTM's inability to do so;

   d.   falsified Earnings Updates, including "active investment" amounts and
        purported returns;

   e.   falsely asserted that the monthly Earnings Updates had been reviewed and
        verified by third-party auditors and CPAs; and

   f.   made and disseminated materially false and misleading statements described
        above.

## IV.   The Offerings Described Above Were Offerings of Securities

66.   Cutting offered and sold investments that are "securities" as defined in Section
2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and
78c(a)(10)].

67.   Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define
"security" to include, among other things, any "investment contract."

68.   The investors' interests in CTM were investment contracts.  The investors made an
investment of money (including digital assets) in CTM and Cutting told investors he would and, in
fact did, pool investor funds together.

69.   The investments were part of a common enterprise whereby Cutting commingled the
investments and traded the money in pooled accounts to execute his purported digital asset trading
strategy and make profits for investors in the private funds and himself.  The investors' investment
of money was passive and they expected profits to be derived solely from the efforts of Cutting
through his purported investment strategies.  Cutting had sole control over the assets in CTM, and

all profits were dependent solely on the work and effort of Cutting; investors had no involvement in CTM's trading activity. Investors were not required to have any experience or knowledge about trading digital assets for profit.

**V.    Cutting's Misrepresentations Were Made and Disseminated "In the Offer or Sale" and "In Connection with the Purchase or Sale" of Securities**

70.    The misstatements and omissions alleged herein were made by Cutting and disseminated by Cutting to induce investors to buy the securities alleged above.

71.    For example, the misstatements and omissions described above were contained in emails and newsletters, as well as oral communications, that solicited new investments and induced investors to leave money with Cutting.

72.    As such, Cutting made and disseminated material misstatements and omissions in the offer or sale of securities as defined in Section 2(a)(1) of the Securities Act and in connection with the purchase or sale of securities as defined in Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

73.    In connection with the conduct alleged in this Complaint, Cutting, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, including soliciting investors located in multiple states by email, providing documents containing false and misleading statements to investors via email, and obtaining funds from those investors through interstate commerce.

**VI.    Cutting Conducted an Unregistered Securities Offering**

74.    Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), make it unlawful for any person, directly or indirectly, to use interstate commerce or the mails, to send a security unless a registration statement is in effect as to the security, or to offer to sell a security unless a registration statement has been filed as to such security.

75.    From no later than October 2017 to at least May 2020, Cutting offered and sold securities in the form of investment contracts when no registration statement was filed or in effect

with respect their offer or sale. Cutting was a necessary and substantial factor in the offerings and sales.  Among other things, Cutting drafted the offering communications and solicited investors.

76.     Defendants offered and sold securities using the means or instruments of interstate commerce, including but not limited to telephones and the Internet.

## VII.   **Relief Defendants Received Proceeds from Defendant's Fraud to Which They Have No Legitimate Claim**

77.     As alleged above, each of the Relief Defendants received proceeds from Defendant's fraud for which they provided no reciprocal goods or services, and to which they have no legitimate claim.  As a result, those funds should be returned to the investors the Defendants defrauded.

### FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5
(against Defendant Cutting)**

78.     The SEC realleges and incorporates by reference above paragraphs 1 through 77.

79.     During the Relevant Period, Cutting, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly: employed devices, schemes, or artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

80.     By engaging in the conduct described above, Cutting violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of Sections 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**(against Defendant Cutting)**

81.    The SEC realleges and incorporates by reference above paragraphs 1 through 77.

82.    During the Relevant Period, Cutting directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly, recklessly, and negligently: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

83.    By engaging in the conduct described above, Cutting violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**
**(against Defendant Cutting)**

84.    The SEC realleges and incorporates by reference above paragraphs 1 through 77.

85.    During the Relevant Period, Cutting directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of a security, offered and sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale, when no registration statement had been filed or was in effect as to such securities

86.    By engaging in the conduct described above, Cutting violated, and unless restrained

and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## FOURTH CLAIM FOR RELIEF

### Equitable Disgorgement
### (against all Relief Defendants)

87.     The SEC realleges and incorporates by reference above paragraphs 1 through 77.

88.     Relief Defendants obtained money, property, and assets which are the proceeds, or are traceable to the proceeds, of the violations of the securities laws by Cutting.

89.     Relief Defendants received gifts and other assets purchased from the proceeds, or that are traceable to the proceeds, of the violations of the securities laws by Cutting.

90.     Relief Defendants received these funds and assets under circumstances in which it is not just, equitable, or conscionable for them to retain the funds or assets, or the benefit of the funds or assets, and therefore have been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the SEC demands a jury trial on all issues triable to a jury and respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Cutting committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently enjoining Cutting from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Order Cutting and each of the Relief Defendants to disgorge all ill-gotten gains from the

violations alleged in this Complaint, and order them to pay prejudgment interest on such ill-gotten gains.

## IV.

Order Cutting to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  March 5, 2021


/s/  Terry R. Miller
_____
Terry R. Miller[1]
Stephen C. McKenna
Attorney for Plaintiff
Securities and Exchange Commission


---

[1] Appearing pursuant to 83.4(c) as an attorney employed by and representing the SEC, a United States agency.