UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiffs,<br><br>  v.<br><br>SHAWN C. CUTTING,<br><br>    Defendants,<br><br>CRYPTO TRADERS MANAGEMENT, LLC, JANINE M. CUTTING, GOLDEN CROSS INVESTMENTS, LLC, LAKE VIEW TRUST, and TYSON TRUST,<br><br>    Relief Defendants. | Case No. 2:21-cv-00103-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff U.S. Securities and Exchange Commission ("SEC") brought this

enforcement action against Defendant Shawn Cutting and Relief Defendants

Crypto Traders Management, LLC, Janine M. Cutting, Golden Cross Investments, LLC, Lake View Trust, and Tyson Trust. The SEC alleges that Cutting lured investors into investing millions of dollars into his company, Crypto Traders Management, LLC ("CTM"), through false representations and then misappropriated investor funds for his personal use in violation of the anti-fraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5. The SEC further claims that Cutting participated in the sale of unregistered securities in violation of the securities registration provisions of Sections 5(a) and (c) of the Securities Act.

The SEC now asks the Court to preclude Cutting from introducing evidence, denials, and defenses that he previously withheld by invoking his Fifth Amendment privilege during deposition. The SEC also asks the Court to enter partial summary judgment on liability. For the reasons set forth below, the Court will grant the SEC's request to preclude Cutting from offering his declaration testimony to the extent it is inconsistent with his invocation of the Fifth Amendment privilege, grant the SEC's motion for partial summary judgment on liability, and deny Cutting's motion to strike the Skidmore Declaration.

## BACKGROUND

### 1. **Procedural Background**

#### A. *The Cryptocurrency Market*

In recent years, popular interest in digital assets has skyrocketed worldwide.
Often called "cryptocurrencies," there are now numerous digital assets based on
blockchain technology, which allows asset owners to hold and transfer assets
without the need for a centralized processing authority. Perhaps the best-known
digital asset is Bitcoin, but there are now more than 5,000 alternative blockchain-
based assets generally known as "altcoins." Altcoin issuers commonly begin sales
of altcoins in "initial coin offerings" or "ICOs" in a process that resembles an
informal initial public offering of unregistered securities. More recently, altcoin
offerings called "initial exchange offerings" or "IEOs" have moved to online
trading platforms purporting to be legitimate securities exchanges engaging in
offerings for companies raising capital. Collectively, ICOs and IEOs are referred to
as "altcoin offerings."

The U.S. Securities and Exchange Commission has noted that altcoin
offerings are frequently conducted in violation of applicable securities regulations
and on exchanges not properly registered with (or exempt from registration with)

the SEC.[1] In the past several years, the SEC has aggressively ramped up enforcement activity against illegal altcoin offerings, as well as other types of fraud associated with altcoin offerings, such as soliciting bogus investment fees from investors or conducting old-fashioned Ponzi schemes dressed up as novel, "cutting-edge" investment opportunities.

### B.  The SEC Investigation and Overview of Allegations

In October 2020, the SEC began investigating Cutting and CTM for securities fraud violations associated with Cutting's cryptocurrency investment fund. As part of the investigation, the staff collected, researched, and analyzed information relating to Cutting's alleged solicitation to invest in CTM and his use of investor funds. Among other things, this analysis involved a review of certain documents provided by Cutting, including a database that Cutting provided. This database contains information concerning investors, their deposits and withdrawals by amount and type (e.g., digital assets vs. wire), transaction dates, gains Cutting purportedly made (and passed on to respective investors) from digital asset trading,

---

[1] *See, e.g, Statement on Potentially Unlawful Online Platforms for Trading Digital Assets*, SECURITIES AND EXCHANGE COMMISSION (Mar. 7, 2018) https://www.sec.gov/news/public-statement/enforcement-tm-statementpotentially- unlawful-online-platforms-trading; *Statement on Cryptocurrencies and Initial Coin Offerings*, SECURITIES AND EXCHANGE COMMISSION (Dec. 11, 2017); https://www.sec.gov/news/publicstatement/ statement-clayton-2017-12-11; *Investor Bulletin: Initial Coin Offerings*, SECURITIES AND EXCHANGE COMMISSION (Dec. 11, 2017) https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings; *Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, SECURITIES AND EXCHANGE COMMISSION (May 7, 2014), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investoralerts/ investor-39

as well as other information. The SEC staff on the investigative team supervised two contract financial analysts employed by the SEC to analyze bank records and other records received.

According to the SEC, this investigation revealed that Cutting, through CTM, defrauded hundreds of investors by calling himself a seasoned financial advisor and misrepresenting that he would pool their money to trade digital assets; but, in truth, Cutting had no experience as a financial adviser, and rather than use the investor money as promised, Cutting used much of the money to pay for various personal expenses. The SEC further maintains that Cutting prolonged the fraud by making hundreds of thousands of dollars in Ponzi-like payments to investors and by sending investors monthly updates touting false gains and returns. Since mid-2020, Cutting has ignored or denied investor requests to withdraw their funds.

On January 7, 2021, the staff took administrative testimony from Cutting pursuant to subpoena. After answering some preliminary questions, Cutting invoked his Fifth Amendment right against self-incrimination and elected not to respond to the remaining substantive questions about CTM.

### C. SEC Enforcement Action

The SEC then filed this enforcement action in March 2021, as well as an emergency ex parte motion for a temporary restraining order. The Court granted

the SEC's request for a TRO based on findings that the SEC established a prima facie case that Cutting defrauded investors and a reasonable likelihood of future violations of the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The TRO provided several forms of relief, including freezing up to $13.8 million of Cutting and Relief Defendants' assets and prohibiting any transfer, encumbrance or distribution of assets. Cutting and Relief Defendants later joined the SEC in a motion for entry of a Stipulated Preliminary Injunction, Asset Freeze, and Order Granting Other Relief which extends the relief granted in the TRO until a final disposition of the action or further Court order. The Court entered the Stipulated Order on March 17, 2021.

Throughout this action, Cutting has submitted limited sworn testimony in declarations and provided some account tracing information pursuant to a Court order but indicated that he would continue to invoke his Fifth Amendment privilege if deposed.

## 2. Factual Background

### A. Cutting, CTM, and Cryptocurrency Fund

Cutting began cryptocurrency investing in early 2017 and started the Crypto Traders Club ("CTC") in August 2017. *Cutting Decl.* ¶ 4, Dkt. 83-3. Upon starting CTC, Cutting began soliciting investors to invest in digital assets, representing both verbally and in emails to potential investors that he had a successful track

record of trading digital assets and outlining his plan to pool investor deposits into a fund, invest in digital assets, and then share the profits with the investors. *Ullman Decl.* ¶¶ 2, 4, Dkt. 49-5; *Skidmore Decl.*, Ex. 11, Dkt. 2-5 at 13; *Wilcox Decl.* ¶ 5, Dkt. 49-6. These representations led investors to invest with him. *See, e.g., Wilcox Decl.* ¶ 5; *Ullman Decl.* ¶ 6 ("Cutting's representations about his successful trading history and plan to pool investor funds in order to invest in digital assets were important to me in deciding to invest with Cutting."). Cutting also used existing investors to bring in new investors with whom he had no pre-existing relationship. *Id.* ¶ 2; *Skidmore Decl.*, Exs. 3-5, Dkt. 2-5 at 3-6.

In October 2017, Cutting sent an email representing he had been a financial advisor for years and had security licenses – although Cutting later admitted he had no experience as a financial adviser, never held any securities licenses, and had no securities background. *Cutting Tr.* 29:18-31:15. Within weeks of sending this email, Cutting received over 120 new investments totaling more than $100,000. *Skidmore Decl.* ¶ 49. And by the end of December 2017, Cutting had raised more than $3.3 million from more than 300 new investors from all over the world. *Skidmore Decl.*, ¶ 14.

With CTC growing, Cutting hired Mike Priest in November 2017 to perform administrative tasks for CTC. *Cutting Decl.* ¶ 5, Dkt. 83-3. Mike Priest then hired Marc Dixon, a computer programmer, to create a "back-office software to keep

track of books." *Id.* ¶ 6. Soon after, in January 2018, Cutting hired a law firm that assisted with forming Crypto Traders Management, LLC ("CTM") to operate a cryptocurrency and other blockchain technology asset trading hedge fund. *Skidmore Decl.*, Ex. 1, Dkt. 2-5 at 1; *Cutting Decl.* ¶¶ 8-9. Cutting did not register CTM with the SEC, claiming that the law firm he hired to prepare the necessary paperwork to form CTM informed him that CTM would be exempt from registration so long as CTM received no more than $5,000,000 in investments per year. *Cutting Decl.* ¶¶ 8-9.

After founding CTM, Cutting transferred his CTC investors to the CTM banner and continued soliciting and receiving new investor funds through at least May 2020. According to the SEC's analysis of the CTM database provided by Cutting, from CTM's formation in January 2018 until at least May 2020, Cutting raised an additional approximately $3.6 million from existing investors and over 150 new investors. This database shows that Cutting and CTM received a total of at least $6.9 million – $2.4 million in cash and $4.5 million in digital assets – from over 450 investors. *Skidmore Decl.* ¶ 17.

### B. Monthly Earning Updates and Newsletters

For those who invested in CTM, Cutting emailed monthly newsletters and an individualized "Earnings Update." Cutting generated the monthly Earning Updates using the "back-office" software created by Marc Dixon. *Cutting Decl.* ¶¶

13, 20. He says he, along with Mike Priest, would access the trading history data online from the various trading exchanges and then export the data from the websites as an excel spreadsheet, inputting gains, deposits, withdrawals, and the like into the system. *Id.* But Cutting misrepresented to investors that the Earning Updates resulted from work done by a "back office" with "auditors" at CTM:

> The short version of how the reporting works, is that CTM (us) reports the trades averaged each week with the gains/losses to the back office, then the Admins do what they do in the back office and when they are done, they report it to the Auditors. After the Auditors do their thing in the back office, they report it to the CPA's. Once all the reporting is finalized, the [sic] it goes back out to the Admins, so that the Admins can send out the reports out of the back office.

*Skidmore Decl.*, Ex. 10, Dkt. 2.5 at 16; *see also Skidmore Decl.* ¶¶ 32, 34, 36; Ex. 12.

The monthly Earning Updates always showed each individual investor's account values with fields for "earnings," "deposits," "withdrawals," and "active investment" expressed as U.S. Dollars. These emails also had a specific field indicating what withdrawals had occurred during that period. These earning updates and newsletters consistently showed rapid growth and ended with a hyperlink to an online form through which recipients could invest additional funds. *Skidmore Decl.* ¶ 30, Ex. 9, Dkt. 2-5 at 14-15; *Wilcox Decl.* ¶ 8; *see also Skidmore Decl.* ¶¶ 31-48.

At least 165 investors made additional investments of over $3 million after receiving the Earnings Updates. *Skidmore Decl.* ¶ 37. For example, "Investor A" made an initial investment of $13,766 in November 2018, and Cutting and CTM sent Investor A the monthly Earning Updates and newsletters with narrative descriptions of digital asset trading, showing monthly gains of 9%, 7%, 4.5%, 7.10%, 8.5%, 6.00%, 6.00%, and 6.67% from December 2018 to July 2019, respectively. And in just one example of a narrative description, CTM reported a 9% gain even though the "crypto world" "had a major down swing" of negative 40%. The next month's narrative reported a 7% gain even though digital assets suffered another 26% loss."  Investor A invested another $17,092 in cash on April 22, 2019, $1075 on May 10, 2019, and $500,000 on July 18, 2019. *Skidmore Decl.* ¶¶ 38-39.

### 3. Actual Use of Investor Funds

Even though the Earning Statement for Investor A reported continual gains from November 2018 to July 2019, CTM's bank records show that the CTM account had a negative balance when Investor A's $500,000 was deposited in the account. Within days, Cutting transferred $300,000 to Golden Cross, his personal investment company, and used $70,000 of Investor A's money to make payments to multiple investors requesting withdrawals. *Skidmore Decl.*  ¶¶ 40, 42. According to the financial analyst's review and analysis of CTM's bank records, this was not

unusual. This financial review revealed that Cutting raised at least $1.69 million in cash from investors from January 2018 through November 2019, and deposited none of that investor cash into CTM accounts for digital asset trading. *Id.* ¶ 17; Ex. 6, Dkt. 2-5 at 7. This same financial review shows that Cutting paid investors $762,302 from the CTM bank accounts from March 2018 through December 2019. Of the $762,302 that was paid to investors, at least $489,650 came from investor funds. *Id.*, Ex. 6.

In addition to using investor cash to redeem prior investors, beginning in February 2018, Cutting also used money from CTM's bank accounts to pay personal expenses, including purchasing groceries, sporting goods, clothing, gold, silver coins, meals, home improvements and a wedding. *Skidmore Decl.* ¶ 24; *see also id.* ¶¶ 25-26; Exhibit 6.

When asked about his use of investor funds for personal use or to make Ponzi-like payments, Cutting refused to answer and instead invoked his Fifth Amendment right against self-incrimination. *See, e.g., Cutting Tr.* 120:17- 121:20; 127:19-128:19; 131:18-132:15; 135:7-136:17 (use of funds for personal expenses generally); 121:21-122:7 (groceries); 122:8-23 (Home Depot and Harbor Freight Tools); 122:24-123:12 (precious metals and coins); 123:21-124:14 (sporting goods); 126:4-127:3 (home improvements); 125:6-20 (wedding); 128:20-129:10 (billiards tables); 129:11-18 (dental services); 130:16-21 (vehicles); 130:22-131:12

("backcountry.com" and REI); 130:13-17 (cash withdrawals); 133:24-135:6 (transfers to Relief Defendant Golden Cross); and 127:4-18; 133:2-23 (Ponzi-type payments); s*ee also Excerpts of Bank Statements*, attached as Exhibit 5 (also found at Exhibit 32 to the Cutting Tr.).

### C. *Withdrawal Requests*

By at least July 2019, when Investor A made the $500,000 deposit, Cutting and CTM had been experiencing issues fulfilling withdrawal requests. After numerous investors complained about not being paid after making a withdrawal request, CTM sent an email to these investors on July 23, 2019, attempting to explain the reason for the delay. The email states that "delays [ ] have accumulated over the past 6 months" and blamed CTM's inability to process withdrawal requests on, among other things, Cutting and CTM's compliance efforts with "State and Federal laws," withdrawal limits from the digital asset trading platforms, theft, hacking, and the loss of $900,000 when an exchange holding CTM assets closed. *Skidmore Decl.*, Ex. 26, Dkt. 2-6 at 24-26. CTM assured investors in that email that "[t]hese minor setbacks are completely normal and out of our control, but we will always solve the tasks at hand and we will continue to work extensively to resolve all matters" and promised to "continue to move forward to do safe, but aggressive trading and send out monthly spreadsheets as usual." *Id.*

By mid-2020 Cutting stopped fulfilling withdrawal requests. By March 31, 2020, the CTM bank accounts had a zero balance. *Id.* ¶¶ 44-45. When investors requested to withdraw funds from CTM, Cutting made excuses, promised updates, and ultimately cut off communication. *Skidmore Decl.* ¶¶ 44-47; s*ee also Wilcox Decl.* ¶ 9; *Ullman Decl.* ¶ 11. Even while ignoring investors' withdrawal demands, Cutting and CTM continued to send Earning Updates to investors reporting gains through at least November 2020.

Cutting later admitted that the monthly Earning Updates "did not accurately reflect the value of each of [the investors'] respective accounts" because the reports did not take into account "the amount of money that CTM has lost due to various exchanges shutting down, money lost due to hackers, investment companies that CTM invested with shutting down and/or blocking access, operation expenses, withdrawal fees, the lack of available coins in the marketplace due to bear market conditions, the drop in prices from what CTM bought positions for and the amount of crypto that people are willing to sell for the current prices." *Skidmore Decl.*, Ex. 12, Dkt. 2.5 at 24-25. But when asked about the accuracy of the Earning Updates during his testimony, Cutting again refused to answer and invoked his Fifth Amendment privilege. *Cutting Tr.* 84:22-85:19.

In fact, during his testimony, Cutting refused to answer any substantive questions about CTM, and instead invoked his Fifth Amendment right against self-

incrimination in response to nearly every question. In addition to refusing to answer questions about his actual use of investor funds and the falsified Earning Updates, he refused to answer question regarding his representations to investors about the intended use of their money, his credentials, and the current value and location of their investments, *Cutting Tr.* at 48:21-50:4, 99:17-100:4; 104:20-105:8; see also id. at 100:9-12 ("Q: Do you assert the Fifth Amendment and refuse to testify in response to any additional questions regarding disclosures to CTM investors? A: Yes, sir."), And, as noted above, when asked whether he would submit to a deposition after the SEC filed this lawsuit, his counsel advised that he would continue to assert his Fifth Amendment right against self-incrimination if he appeared for testimony. The SEC therefore did not bother deposing Cutting a second time, knowing that he would not answer their questions.

### 4. Cuttings Declaration in Response to Summary Judgment

Although Cutting indicated he would continue to assert his Fifth Amendment privilege if deposed again, he submitted a declaration in response to the SEC's motion for summary judgment. In this declaration, Cutting attempts to defend the veracity of his various representations – or his belief in their veracity at the time he made them.

With respect to his representation to investors about his experience as a "financial advisor" and his holding a securities license, Cutting says he and his

wife "were senior marketing directors for WFG (World Financial Group] and

[they] obtained several different licenses under [his wife's] name," and, at the time

he made the statement, he "thought" one of the licenses "we" had completed was a

securities license. *Cutting Decl.* ¶ 15. Those licenses that his wife held included an

"Insurance Producer License" for the state of Washington; an "Insurance License"

for the state of Montana; a "Non-Resident Producer, Health, Life Insurance

License" for the state of Nevada; a "Resident Producer Insurance License" for the

state of Idaho. *Id.*; Ex. 6, Dkt. 83-4 at 111-116. None of the licenses held under his

wife's name was a securities license.

   Cutting also claims that he and his wife, when at WFG, "were called a

financial advisor in regard to how money works," and, in any event, no one

invested in CTM based on his statement about his supposed experience as a

financial advisor holding securities licenses…because only clients who saw [his]

monthly newsletters were clients who were already invested with [CTM]." *Id.* ¶ 17.

In fact, Cutting claims he never solicited investors. *Id.* ¶ 19.

   With this explanation, Cutting seems to imply that he thought his

representation to investors that he had years of experience as a "financial advisor"

and held a securities license was true at the time he made it. When asked about this

representation during his testimony, however, Cutting refused to respond and

instead invoked his Fifth Amendment right against self-incrimination. *Cutting Tr.*
45:19-46:18, 48:16-20.

Cutting also claims his representation regarding how Earning Updates were
generated – i.e., CTM reported trades to the "back office," and then the "Admins"
"d[id] what they d[id] in the back office" and then reported it to the "Auditors,"
who did "their thing in the back office" and then reported it to "the CPA's" – was
true "based on the fact that CTM was operating with a back-office software
program what was developed with the advice, expertise, and assistance" of various
professionals, such as bookkeepers, attorneys who helped form CTM, a CPA who
did CTM taxes, and a CPA "who advised Mike [Priest] at CTM regarding
accounting." *Cutting Decl.* ¶ 14. Cutting does not specify how these professionals
assisted with developing the "back-office software."

And while Cutting admits the monthly Earning Updates were not accurate,
he claims he believed they were accurate at the time he sent them "as they were
generated from CTM's system," and he only discovered the "back-office software
problems…that contributed to the miscalculation and misreporting of clients'
balances" after this litigation was filed. *Id.* ¶ 42. Cutting blames these same errors
to explain why he "did not know about the losses when an email was sent out to
CTM investors to answer email questions about delays in processing withdrawals."
He says he had no intention to mislead investors because he "was not aware of the

errors in the back-office software which was developed and maintained by Marc Dixon." *Id.* ¶ 47.

Despite having invoked the Fifth Amendment, Cutting also now disputes that he used any investor funds for personal expenses, claiming any funds transferred out of the CTM bank accounts were his "personal funds," *id.* ¶¶ 40, 38a-k, including the $500,000 that Investor A deposited in July 2019. According to Cutting, these funds were funds paid to him for "selling my own personal property of PROC coins, funds that investors sent me personally to invest in crypt that I bought for them for no charge and sent right directly back to them so they could hold their own crypto, funds that I deposited personally from any of my other streams of income along the way, and money that I borrowed personally, and a small amount of those funds were sent to my personal bank account just so I can buy them crypto and sent to the trading fund where it was used for trading." *Id.* ¶¶ 38a-k.

Finally, in attempt to explain why Cutting stopped paying out investors who requested to withdraw their investments in mid-2020, Cutting says "it was clear there was some larger problem," but at the time he "still didn't fully understand the problem." *Id.* ¶ 48. Cutting further testifies that he "had no idea about the back-office issues or overpayments or else [he] definitely would not have paid out clients who were paid their accounts in full when [he] made the statements."

Contrary to the evidence, Cutting further maintains he never cut off

communications with clients until litigation was filed and that the Earning Updates

continued to be automatically generated and sent to clients because he did not

know they contained errors and inaccuracies.

## ANALYSIS

### 1. **Motion to Strike Skidmore Declaration**

Cutting moves to strike the declaration of Matthew L. Skidmore on the

grounds that many statements lack foundation or are not based on Mr. Skidmore's

personal knowledge. The Court will construe Cutting's request to strike the

Skidmore Declaration as an objection under Rule 56(c)(2).

Rule 56(c) governs the procedures to support or oppose a motion for

summary judgment, and Rule 56(c)(2) provides that parties "may object that the

material cited to support or dispute a fact cannot be presented in a form that would

be admissible in evidence." The Advisory Committee Notes to the most recent

amendments to Rule 56 provide that a Rule 56(c)(2) objection "functions much as

an objection at trial, adjusted for the pretrial setting. The burden is on the

proponent to show that the material is admissible as presented or to explain the

admissible form that is anticipated." Fed. R. Civ. P. 56 advisory committee's note

(2010 Amendments). "In determining admissibility for summary judgment

purposes, it is the contents of the evidence rather than its form that must be

considered." *Ellis v. Corizon, Inc.*, No. 1:15-CV-00304-BLW, 2018 WL 6271823, at *5 (D. Idaho Nov. 30, 2018) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)). "If the contents of the evidence could be presented in an admissible form at trial, those contents are admissible on summary judgment." *Id.* (citing *Fraser*, 342 F.3d at 1037).

As the evidence presented in Skidmore's declaration could be admissible in a different form at trial, the Court will overrule Cutting's objections to the declaration. *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (overruling objections based on hearsay and to the best evidence rule to affidavit of litigation adviser because facts underlying the affidavit could be presented in an admissible form at trial). For example, Cutting objects to Mr. Skidmore's testimony to the extent it is based on the financial analysts' review and analysis of the information Cutting provided during the SEC's investigation and not on Mr. Skidmore's personal knowledge. In addition, Cutting objects to Mr. Skidmore's testimony to the extent he summarizes records or makes statements based on representations Cutting allegedly made to investors. But a summary of the bank records could be presented at trial through a summary witness and the financial analyst could testify to their review and analysis of the records. Likewise, investors could testify to what Cutting and CTM represented to them. As these examples illustrate, because all the statements to which Cutting objects could be presented in an admissible

form at trial, the Court will overrule the objections to the extent the Court relies on

the objected-to testimony in summary judgment. Otherwise, the Court finds the

other objections moot.

## 2. Evidence Preclusion

The second threshold evidentiary issue presented is whether the Court

should disregard Cutting's exculpatory declaration testimony based on his

invocation of the Fifth Amendment privilege in response to nearly all the SEC's

questions regarding CTM.

"It is well-accepted that a witness' direct testimony can be stricken if she

invokes the fifth amendment on cross-examination to shield that testimony from

scrutiny." *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990); *United

States v. $133,420.00 in U.S. Currency,* 672 F.3d 629, 640 (9th Cir. 2012) (holding

a court may strike the testimony of a witness in a civil proceeding to avoid a

witness's improper use of the Fifth Amendment privilege against self-

incrimination as a sword as well as a shield) (collecting cases). "The purpose of

this rule is to protect the integrity and truth-seeking function of the judicial system

from the distortions that could occur if a witness could testify and then use the

Fifth Amendment privilege to prevent any adversarial testing of the truth of that

testimony." *$133,420.00 in U.S. Currency*, 672 F.3d at 640. "By striking testimony

that a party shields from cross-examination, a court can respect the witness's

constitutional privilege against self-incrimination while still preventing the witness from using the privilege to mutilate the truth a party offers to tell." *Id.* (quoting *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988) (quoting *Brown v. United States*, 356 U.S. 148, 156 (1958)) (internal quotation marks omitted).

Cutting's consistent invocation of the Fifth Amendment until the eleventh hour warrants this Court's striking his declaration testimony. The SEC took Cutting's testimony on January 7, 2021, prior to filing this action, and during his testimony, Cutting asserted his Fifth Amendment rights and refused to answer any substantive questions relating to CTM, including:

- "Mr. Cutting, at this time [you wrote the email saying you had been 'a financial adviser for years and have my life, health, and security licenses'], you had not been a financial adviser for years, correct?," *Cutting Tr.* 46:8-15, *Skidmore Decl.*, Ex. 27, Dkt. 2-6.

- "Was investors' money that was invested in CTM immediately sent to exchanges or digital asset platforms and placed in trading [as you represented in an email]?," *id.* 46:19-5;

- "[Y]ou told investors that you could make profits for them by trading digital assets held by CTM…and that gains from the pooled investments in CTM would be shared by all investors?," *id.* 49:2-9;

- "You never disclosed to CTM investors that you would or did spend their money on your personal expenses…[or] that you would or did spend their money to pay existing investors who wanted to withdraw funds from CTM?," *id.* 99:17-24;

- "The Wells Fargo accounts opened in CTM's name were funded with investor money…[and] were opened for the business…[and] were not for your personal benefit?," *id.* 100:16-24;

- "You withdrew CTM investor funds or digital assets for your own personal expenses?," *id.* 101:13-14;

- You withdrew new CTM investor funds to pay existing CTM investors who wanted to withdraw money from their CTM accounts?," *id.* 101:16-19;

- "You did not track each investor's percentage of ownership in the digital assets purchased with the investor's pooled assets in CTM?," *id.* 105:17-20.

When the SEC asked Cutting to submit to a deposition during discovery, Cutting indicated he would continue to invoke his Fifth Amendment privilege.

In opposition to summary judgment, however, Cutting now attempts to speak on these very matters for which he previously invoked the privilege. "But

the Fifth Amendment privilege cannot be invoked as a shield to oppose

depositions" and then tossed aside to support a party's assertions. *In re Edmond*,

934 F.2d 1304, 1308 (4th Cir. 1991); *see also S.E.C. v. Art Intellect, Inc.*, No. 2:11-

CV-357, 2013 WL 840048, at \*10 (D. Utah Mar. 6, 2013) (quoting *SEC v.*

*Zimmerman*, 854 F.Supp. 896, 899 (N.D.Ga.1993) ("The Fifth Amendment

privilege cannot be invoked to oppose discovery and then tossed aside to support a

party's assertions."). Courts therefore have consistently stricken affidavit or

declaration testimony under similar circumstances. *See, e.g., Art Intellect, Inc.*,

2013 WL 840048, at \*10 (collecting cases).[2] As the Second Circuit explained, if a

---

 [2] *See, e.g., SEC v. Hirshberg*, 173 F.3d 846, Case Nos. 97–6171 & 97–6259, 1999 WL 163992 (2d Cir. Mar. 18, 1999) (table decision) (precluding evidence of defendant who waived Fifth Amendment privilege after SEC filed summary judgment motion, finding that it would be prejudicial to SEC to allow defendant, who waited four years to respond to the motion, to tailor his affidavit to create an issue of fact for trial); 4003–4005 5th Ave., 55 F.3d at 85 (noting that if litigant's waiver of privilege comes at "eleventh hour" and "appears to be part of a manipulative, 'cat-and-mouse' approach to the litigation, a trial court may be fully entitled ... to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege"); *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir.1991) ("By selectively asserting his Fifth Amendment privilege, [the defendant] attempted to insure that his unquestioned, unverified affidavit would be the only version [of his testimony]. But the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion."); United States v. Parcels of Land, 903 F.2d 36, 43–44 (1st Cir.1990) (affirming order striking affidavit opposing government's summary judgment motion when witness "shielded his account of the 'facts' from scrutiny by invoking the Fifth Amendment at his deposition."); *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 857 (S.D.N.Y.1997) (noting that defendant's waiver of privilege three months after SEC moved for summary judgment was "convenient" and that defendant "simply may not invoke his privilege against self-incrimination to impede the government's discovery efforts and then seek to waive the privilege when faced with the consequences of his refusal to testify."); *SEC v. Grossman*, 887 (Continued)

litigant in a civil proceeding seeks to waive his Fifth Amendment privilege only at the "eleventh hour," and such waiver "appears to be part of a manipulative, 'cat-and-mouse approach' to the litigation," a trial court may bar the litigant "from testifying later about matters previously hidden from discovery through an invocation of the privilege." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 85 (2d Cir. 1995).

This is precisely what Cutting attempts to do here, and such conduct justifies the preclusion of Cutting's declaration testimony with respect to matters shielded from discovery through the assertion of the privilege. *Id.* While Cutting certainly has the right to either assert the privilege **or** provide unlimited declaration testimony, "he cannot have it both ways." *Sec. & Exch. Comm'n v. Premier Holding Corp.*, No. SACV1800813CJCKESX, 2020 WL 8099514, at *5 (C.D. Cal. Nov. 30, 2020) (quoting *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987); *see also SEC v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998) (citing *Benson* with approval). Cutting "has received the benefit of the Fifth Amendment privilege

---

F.Supp. 649, 660 (S.D.N.Y.1995) (precluding evidence at summary judgment stage on the issues for which the defendants had "declined to provide discovery for several years" under the guise of the Fifth Amendment privilege against self-incrimination); *SEC v. Zimmerman*, 854 F.Supp. 896, 899 (N.D.Ga.1993) ("The Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions.")

at every stage of this proceeding, and now he must also bear the consequences of that decision." *United States Sec. & Exch. Comm'n v. Ahmed*, 308 F. Supp. 3d 628, 650 (D. Conn. 2018) (citing *4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d at 82. "By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up his right to prove them." *Id.* (quoting *Benson*, 657 F. Supp. at 1129) (internal quotation marks omitted).

Cutting's argument that he has submitted limited sworn statements and produced some documents misses the point.  He invoked the Fifth Amendment privilege when subject to cross-examination and refused to testify about the documents he produced, thereby denying the SEC "an opportunity to test the veracity of his claims" and impairing "the truth-seeking function of the judicial process." *Ellis v. Brady*, 2017 WL 6327083, at *4 (S.D. Cal. 2017). The fact that Cutting has submitted self-serving declarations and provided an unsworn and incomplete explanation of CTM's accounting software after the close of discovery in February 2022 does not change this analysis – particularly when Cutting explicitly indicated he would continue to assert his Fifth Amendment privilege if deposed after this litigation was filed.

### 3. Motion for Summary Judgment

#### A.  Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . .." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs.*, Inc., 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### B. Violations of Sections 17(a), 10(b) and SEC Rule 10b-5

The SEC asserts claims under the antifraud provisions of both the Exchange

Act and the Securities Act. "The antifraud provisions of the Securities Act, Section

17(a)(2), and the Exchange Act, Section 10(b), developed through Rule 10b-5(b),

forbid making a material misstatement or omission in connection with the offer or

sale of a security by means of interstate commerce." *U.S. Sec. & Exch. Comm'n v.*

*Hui Feng*, 935 F.3d 721, 734 (9th Cir. 2019) (quoting *SEC v. Dain Rauscher, Inc.*,

254 F.3d 852, 856 (9th Cir. 2001) (quotation marks omitted). These provisions

prohibit making (1) a material misstatement or misleading omission of material

fact (2) in connection with the offer or sale of a security (3) by means of interstate

commerce. *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007). A fact is material if

there is a substantial likelihood that a reasonable investor would consider it

important in making a decision because the fact would significantly alter the "total

mix" of available information. *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1982). A

statement is misleading if "it would give a reasonable investor the impression of a

state of affairs that differs in a material way from the one that actually exists." *In re*

*Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (quotation marks omitted).

Here, the SEC has satisfied the second and third elements because the SEC

has shown that Cutting raised millions of dollars through selling "securities" in the

form of "investment contracts," *see SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99

(1946) (defining "investment contract"),[3] and Cutting only challenges the SEC's

allegations of material misstatements, deceptive conduct, and scienter.

### A. *Cutting Made False Statements and Omissions in Connection with the Purchase or Sale of Securities.*

Sections 17(a) of the Securities Act prohibits persons, in the offer or sale of

a security, from employing any device, scheme or artifice to defraud; obtaining

money or property through materially false or misleading statements or omission

of material facts; or engaging in any transaction, practice, or course of business

which operates as a fraud or deceit. *United States v. Naftalin*, 441 U.S. 768, 772–

73 (1979). Section 10(b) of the Exchange Act and Rule 10b–5 prohibit similar

conduct in connection with the purchase or sale of a security. Section 10(b) was

designed to prevent all manner of fraudulent practices. *See, e.g., Chiarella v.*

*United States*, 445 U.S. 222, 226 (1980).

The SEC assets that Cutting made three categories of material false and

misleading statements to investors: "(1) that Cutting intended to use investor

money to trade digital assets, SOF ¶ 3; (2) that cash investments were being used

to trade digital assets and earned specific returns as represented in a monthly

---

[3] "An investment contract an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *Howey*, 328 U.S. at 298–99.

'Earnings Update,' SOF ¶¶ 4-5; and (3) that Cutting had been a financial adviser and had securities licenses, SOF ¶ 6-8." *SEC Opening Br.*, p. 10-11, Dkt. 49-1. Cutting made the statements in the emails he sent and in his oral statements to investors. Cutting also qualifies as the "maker" of the statements attributed to CTM because, as the owner and operator of CTM, Cutting had "ultimate authority over" each of these statements, "including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (To establish liability under Section 10(b) and Rule 10b-5(b) thereunder, the SEC must show that the defendant was the "maker" of the misstatements).

### (1) Intended Use of Investor Funds

Cutting's representations that he intended to use investor money to trade digital assets was a material misrepresentation of fact. Unbeknownst to investors, Cutting misappropriated investor funds and used them to pay for personal expenses, such as purchasing groceries, sporting goods, clothing, gold and silver coins, meals, home improvements, and a wedding. Cutting also used new investor funds to make the promised profit payments to earlier investors—a classic Ponzi scheme. The SEC has further demonstrated that investors invested with Cutting and CTM in reliance on those statements that their funds would be pooled and invested in digital assets. That Cutting may have used *some* investor funds to trade

in digital assets as represented does not negate that Cutting misappropriated and misused millions of investor funds.

Cutting, in fact, admits that he used the CTM account to pay his personal expenses but claims that all funds in the CTM account were his "personal funds" that he received for selling his own digital assets, or that investors sent to him "personally to invest in crypt that [he] bought for them for no charge and sent right directly back to them so they could hold their own crypto," or funds that he deposited form his other streams of income, or money that he borrowed personally. *Cutting Decl.* ¶ 38. Cutting maintains only "a small amount of those funds" were sent by investors to the CTM account, which he characterizes as his "personal bank account," so he could "buy them crypto" and was "sent to the trading fund where it was used for trading." *Id.* Cutting, however, offers no proof for these assertions (such as ledgers or tallies) other than his own self-serving declaration testimony, and the Court has struck that testimony as inconsistent with Cutting's prior invocation of the Fifth Amendment privilege.

### (2) *Earning Updates*

The monthly Earning Updates and newsletters were also materially false and misleading. Cutting, again, admits that the Earning Updates did not accurately reflect the investors' returns, and it goes without saying that reasonable investors would consider it important to know that Cutting had not invested their money as

reflected in the Earnings Updates, and they had not earned the returns those documents reflected. *C.f.,* S*toneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008) (fake documentation used in securities offerings is deceptive conduct). Likewise, Cutting concedes that "auditors" in the "back-office" did not review the Earning Updates on an ongoing basis as he represented to investors, but instead the Earning Updates were generated using a "back-office software" based on data he inputted – a fact, had it been accurately disclosed, "that would significantly alter the 'total mix' of available information" and a reasonable investor would undoubtedly consider important. Cutting further deceived investors by continuing to send them false Earning Updates while ignoring or denying their withdrawal requests with misleading and false excuses.

> (3) *Experience as a "Financial Advisor"*

Finally, Cuttings' representations regarding his experience as a financial advisor and his holding a securities license were materially false and misleading. Cutting had no experience as a financial advisor, did not hold a securities license, and had no securities background. Once again Cutting admits these facts but says his wife held insurance licenses for both of them, and he "thought" one of these licenses held in his wife's name was a securities license. But this is not what Cutting told investors, and the fact his wife held insurance licenses in her name does not make it true that Cutting held a securities license in his own name.

Significantly, after making this representation, Cutting received over 120 new investments that totaled more than $100,000 with three weeks of misrepresenting his experience. As demonstrated by this evidence, such misrepresentations were material.

### B. Cutting Acted with the Requisite Scienter.

Violations of Section 10(b), and Rule 10b-5 require the SEC to prove that Cutting acted with scienter. *Phan*, 500 F.3d at 908. "The term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Scienter can be established by showing knowledge or recklessness. *Feng*, 935 F.3d at 734; *see also Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). By contrast, violations of Securities Act Sections 17(a)(2) and (3) can be proven by showing negligence, rather than scienter. *Id.* (citing *Aaron v. SEC*, 446 U.S. 680, 695-97 (1980)). Negligence "is the failure to exercise reasonable care under all the circumstances." *Robare Group, Ltd. v. SEC*, 922 F.3d 468, 477 (D.C. Cir. 2019) (citation and quotation marks omitted); *see also Dain Rausher*, 254 F.3d at 856 (negligence measured by standard of "reasonable prudence").

The SEC has introduced compelling evidence that Cutting acted not only with negligence but with scienter. As the sole owner and operator of CTM, Cutting knew CTM's business, its investments, and use of investor funds. Cutting knew

that he was using investor funds deposited into the CTM account to pay his personal expenses and to make Ponzi-like payments. He also knew that he had no experience as a financial advisor and did not hold a securities license in his own name. And his conduct in preventing investors from discovering his fraud – falsified Earning Updates that Cutting knew were not reviewed by a team of auditors in the back-office, monthly newsletters touting gains, and Ponzi-like payments—is further strong evidence of Cutting's scienter. *See, e.g., SEC v. Wang,* No. LA CV13-07553 JAK (SSx), 2015 WL 12656906, *17 (C.D. Cal., Aug. 18, 2015) (quoting *United States v. Brown*, 578 F.2d 1280, 1285 (9th Cir. 1978)).

The evidence presented by the SEC of Cutting's scienter is further corroborated by adverse inferences based on Cutting's assertions of the Fifth Amendment privilege in his testimony. "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof." *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). "While the strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case, the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir.1997), *aff'd in part, rev'd in part on other grounds*, 178 F.3d

114 (2d Cir.1999) (citation and internal quotation marks omitted). "An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *Id.*; *see also United States ex rel. Bilokumsky*, 263 U.S. 149, 153–54 (1923) ("Silence is often evidence of the most persuasive character.").

No blanket rule exists, however, allowing an adverse inference to be drawn in every case where a defendant has invoked his Fifth Amendment privilege. Because there is "tension between one party's Fifth Amendment rights and the other party's right to a fair proceeding," adverse inferences may only be taken when certain conditions are met. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000). Specifically, the court must analyze the circumstances of the litigation and balance the competing interests of the party asserting the privilege against whom the privilege is invoked. *Glanzer*, 232 F.3d at 1264; *see also Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911-12 (9th Cir. 2008). In that light, no negative inference can be drawn against a civil litigant's assertion of his privilege against self-incrimination unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information." *Id.* at 1265 (quotation omitted); s*ee also Richards*, 541 F.3d at 911-12; *SEC v. Jasper*, 678 F.3d 1116, 1125-26 (9th Cir. 2012). In addition, "an adverse inference can be drawn [only] when silence is countered by *independent*

*evidence* of the fact being questioned." *Glanzer*, 232 F.3d at 1264 (emphasis in original).

As previously noted, Cutting invoked the Fifth Amendment and refused to answer questions about CTM generally, and when specifically asked about: (1) his purported experience as a "financial advisor" and whether he held any securities licenses at the time he represented to investors that he had been a "financial advisor" for years; (2) his use of investor funds to pay personal expenses; (3) his representations to investors regarding the intended use of their money and the current value and location of their investments; and (4) his admittedly false Earning Updates.

The adverse inferences from Cutting's assertions of the Fifth Amendment are that (1) he engaged in a scheme to solicit investor funds for investment in digital assets through material misstatements and misleading omissions of material fact regarding Cutting's credentials and experience and his intended use of investor funds, (2) he knowingly made those misstatements and omissions, and (3) then he misappropriated investor funds for his personal use and to make Ponzi-like payments. The Court believes it is appropriate to make the adverse inferences against Cutting. First, the adverse inferences are supported by the independent evidence discussed above. Second, the SEC has substantial need for the information it sought from Cutting regarding his scienter because he is undeniably

the final decisionmaker as the founder and owner of CTM and scienter is an essential element of the SEC's claims against him. And finally, there is no alternative, less burdensome method to obtain information about Cutting's scienter. Only Cutting can testify about his mental state and only Cutting can offer first-person information about his role in CTM and the wrongful acts underlying the SEC's claims.[4]

Accordingly, the SEC's motion for summary judgment is granted on liability as to its claims against Cutting for violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### 4. Violations of Sections 5(a) and 5(c) of the Securities Act

---

[4] Even if the Court were to consider Cutting's last-minute declaration testimony and not draw an adverse inference, such testimony is chock full of the type of bald and implausible assertions that cannot defeat summary judgment. *Itzhaki v. United States Liability Insurance Company*, 536 F. Supp. 3d 651, 654 (C.D. Cal. 2021) ("[T]he bald assertion that a genuine issue of material fact exists does not preclude summary judgment."). For example, Cutting's suggestion that he "thought" one of his wife's insurance licenses was a securities license and therefore he believed this meant he held a securities license simply defies belief.

Similarly, it is implausible that Cutting only discovered the alleged "errors" in the Earnings Updates after this litigation was filed. Cutting continually touts his experience and knowledge of digital assets that conflicts with the type of chronic errors he happened to "discover" years after the fact. He did not "discover" massive errors when he was unable to repay investors (that happened in 2018). Indeed, rather than do the purported "work" to "discover" the purported mistakes, Cutting emailed his investors that the Powell lawsuit was "bogus" and continued to invite investors to give him more money when downplaying the SEC's investigation. *Skidmore Decl.* ¶ 58. This deliberate avoidance of what Cutting knew his records showed stems from scienter, and not plausibly an honest mistake.

The SEC also alleges that Cutting violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c) by selling unregistered securities. "It is unlawful to participate in an interstate or mail sale of unregistered securities." *S.E.C. v. Phan*, 500 F.3d 895, 901 (9th Cir. 2007). "In order to establish a Section 5 violation, [plaintiff] must point to evidence that: (1) no registration statement was in effect as to the securities; (2) [defendant] sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce." *Phan*, 500 F.3d at 902 (quoting *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 212 (3d Cir. 2006)). Section 5 does not require registration as to only the first sale of a security. *See id*. Instead, "[e]ach sale of a security ... must either be made pursuant to a registration statement or fall under a registration exception." *Id.* (quoting *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998)).

"Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption." *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir.1980) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)). Any claimed exemption is strictly construed against the claimant. *Murphy*, 626 F.2d at 641. Section 5 liability extends beyond those who sell stock in unregistered transactions to those who are "both a 'necessary participant' and 'substantial factor' in the sales transaction[s]." *Phan*, 500 F.3d at 906 (9th Cir. 2007). Sellers of securities include

persons who solicit purchases and who are "motivated at least in part by a desire to serve [their] own financial interests." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). The use of intermediaries between the seller and purchaser does not limit liability. *See SEC v. Wolfson*, 539 F.3d 1249, 1261, n. 20 (10th Cir.2008) (Section 5 is not limited to persons who actually sell a security).

It is undisputed that Cutting, through CTM, received money and digital assets from investors purportedly to be pooled with other investors' funds for the purposes of trading in digital assets, and such pooled investments constitute "securities" because they are "investment contracts" under *Howey.* It is further undisputed that there was no registrations statement in effect or filed with the SEC for the offer or sale of the pooled CTM investments. Thus, the SEC has established a *prima facie* violation of Sections 5(a) and (c).

Cutting here does not identify a specific exemption that applies but instead argues that the law firm he hired to assist with the formation with CTM was to file "a Form D on behalf of CTM with the SEC, which gives notice that CTM will sell securities without registration under the Act under a claimed exemption," and therefore "Cutting understood CTM was exempt from the registration requirement and was otherwise fully compliant." *Defs' Resp. Br.*, p. 17, Dkt. 83. But scienter is not an element of Section 5. *Aaron*, 446 U.S. at 714. Cutting's "understanding" regarding his compliance therefore makes no difference in refuting the SEC's

*prima facie* case. *C.f. Chanana's Corp. v. Gilmore*, 539 F. Supp. 2d 1299, 1304 (W.D. Wash. 2003). Rather, the burden falls on Cutting to (1) identify an applicable exemption, and (2) offer proof that the identified exemption applies. *See, e.g., S.E.C. v. Alternate Energy Holdings, Inc.*, No. 1:10-CV-00621-EJL, 2014 WL 2515710, at *5 (D. Idaho May 13, 2014) ("[T]he burden is upon Defendants to show entitlement to the exception."). He fails in both respects here.

At best, Cutting declares that "CTM" transactions were exempted in part from registration because CTM did not directly solicit investments from clients and would not be taking in more than $5 million in a 12-month period, and CTM's back-office software was set up to monitor these limits." *Defs' Resp. Br.*, p. 17, Dkt. 83. The Court, however, should not and will not examine the different exemptions and comb through the record to ascertain whether Cutting could establish one. And, in any event, the evidence demonstrates that he both directly and indirectly solicit investments by operating a website inviting anyone to deposit money and digital assets without any limit to the investment opportunity, sending out emails touting his qualifications and trading experience, sending monthly Earning Updates, which included a link to make additional deposits, ***and*** by having existing investors solicit investors to whom he paid commissions. He therefore cannot defeat summary judgment with his bald assertion that he did not solicit investors when the evidence shows otherwise.

Accordingly, the Court concludes that Cutting have failed to satisfy their burden of showing a question of fact exits on the issue of whether its offers were exemption from the registration requirement.

ORDER

**IT IS ORDERED that:**

1. Plaintiff United States Securities and Exchange Commission's Motion for Summary Judgment on Liability (Dkt. 49) is GRANTED.

2. Defendant Shawn Cutting's Motion to Strike Declaration of Mathew L. Skidmore in Support of Plaintiff's Ex Parte Emergency Motion for Restraining Order, Asset Freeze, Order to Show Cause, and Other Relief [49-3] (Dkt. 84) is DENIED.

DATED: September 28, 2022

B. Lynn Winmill
U.S. District Court Judge